594 S.E.2d 851

Doug MATHIS, as trustee of the Firemen's Insurance and Inspection Fund for the City of Sumter Fire Department, Appellant,

v.

Elizabeth C. HAIR, Sumter County Treasurer, and Elizabeth C. Hair, Joe Floyd, and Wayne Hunter, as trustees for the Sumter County Firemen's Insurance and Inspection Fund, Respondents.

No. 3547.

Court of Appeals of South Carolina.

Heard June 4, 2002.

Decided Sept. 9, 2002.

Withdrawn, Substituted, and Re-filed Jan. 17, 2003.

Charles E. Carpenter, Jr. and S. Elizabeth Brosnan, of Columbia; and Jack W. Erter, Jr., and David C. Holler, of Sumter, for appellant.

Andrew F. Lindemann, of Columbia, for respondents.

STILWELL, J.:

Doug Mathis, as a trustee of the Fireman's Insurance and Inspection Fund for the City of Sumter Fire Department, brought this action against the Sumter County Treasurer and others seeking disbursement of $84,500 to the City's Fireman's Insurance and Inspection Fund. The circuit court denied the request for relief and the City appeals. We reverse and remand.

## FACTUAL/PROCEDURAL BACKGROUND

The South Carolina Fireman's Insurance and Inspection Fund (the fund) is a unique fund established for the benefit and enjoyment of firefighters throughout the State. *See* S.C.Code Ann. § 23–9–410 (1989). Fund monies must be used solely "for the betterment and maintenance of skilled and

efficient fire departments within the county." *Id.* Fund monies may not be used to purchase items for which the governmental unit the fire department serves is legally liable, such as fire trucks or equipment. S.C.Code Ann § 23–9–460 (1989).

The fund is financed by a percentage of fire insurance premiums. Every fire insurer in South Carolina is required to pay one percent of its premiums to the state treasurer and to file a report allocating the collected premiums to the county in which the insured property is located. S.C.Code Ann. §§ 38–7–40 (pay one percent),–70 (report) (2002). The state treasurer forwards the allocated funds to the treasurers of each county. § 23–9–410. The county treasurers then make disbursements to the trustees of the local fire departments based on the "assessed value of improvements to real estate within the *service areas* of the fire department. . . ." S.C.Code Ann. § 23–9–420 (1989) (emphasis added). The controversy in this case focuses on the meaning of "service area" as used in the statute.

There are 72 full-time firefighters and some part-time firefighters with the City fire department. The County fire department consists of 240 volunteer firefighters who have the option of responding to fires after being notified. Mathis is the chief of both the City and County fire departments, as well as a trustee of the fund for the city.

Sumter County has seven tax districts, all of which are served by either the City or County fire departments. Five of the districts are in unincorporated areas of Sumter County. The two remaining districts are within the City limits and receive fire protection services from the City's fire department. Additionally, the City provides primary fire protection to some areas outside its corporate boundaries in exchange for payment from the County. The value of the property Mathis contends is primarily served by the City's fire department accounts for approximately 69% of the total assessed value of real property in Sumter County.

Sumter County's treasurer historically distributed the fund money to the department that provided primary services or "first response" to a fire within a particular district. Using this approach, the treasurer historically awarded the City fire department 65% and the County fire department 35% of the

proceeds. In July 1999, the state treasurer distributed approximately $130,000 to Sumter County Treasurer Elizabeth Hair for distribution to the local fire departments. The City sought 65% of the funds, or $84,500. However, Hair chose to distribute the funds according to geographic boundaries rather than the primary service area. Based upon the assessed property values within the City's limits, she proposed the City receive 43% of the funds, or $58,167.90, and the County receive the remainder.

Mathis initially sought a writ of mandamus but later amended this action to seek a declaratory judgment. Mathis sought disbursement of $84,500 of the total $130,000 to the City fire department. Hair and the trustees of the County's fund answered, alleging the City's department was only entitled to 43% of the fund.

In a deposition presented at trial, Robert Colvin, Executive Director of the South Carolina State Fireman's Association, explained the association considers the "service area" of a fire department to be where the department provides first response fire services rather than strict geographic boundaries. Colvin stated that where two fire departments share a coverage area, the association believes the departments should equally share the monies collected from that area. Colvin testified that every other county in South Carolina distributes the fund based on which particular fire department provides services in the particular area.

Hair testified that although the funds were historically distributed to the fire departments according to which department was responsible for the first response services in a particular district, she determined upon review of the statute that the funds had been wrongly distributed in the past. She determined that the phrase "service areas of the fire department" referred to the City fire department for the areas within, or incorporated into, the City limits and to the County fire department for the unincorporated areas outside the City limits. Although the City fire department exclusively served District 1 located in an unincorporated area of the county, Hair decided to treat the district as the County fire department's service area because it was outside the City limits. Hair acknowledged the County's oral contract with the City

fire department to provide services to some of the unincorporated areas of the County. She testified that the County paid the City $955,000 in exchange for the City providing firemen to a station in an unincorporated area, with the County government providing the equipment. Hair believed the contract did not affect which fire department received the funds because it was silent on that issue and absent an agreement to the contrary the funds were "a benefit for the firemen."

Sumter's city manager testified the longstanding contract between the City and the County was oral because of the good working relationship between the entities. Importantly, the contract called for the City fire department to be primarily responsible for certain unincorporated areas so those areas could receive more favorable insurance ratings, and thus attract industry. Because the governments relied upon the first response formula in place for many years, they never discussed the allocation of the fund.

The circuit court found the phrase "service areas of the fire department" in the statute to be ambiguous, and further found there was no contract for the County fire department to give up a portion of its service area or the 1% premiums attributable to those areas. The court agreed with Hair that the City's "service area" was limited to its corporate limits absent an agreement to the contrary, and thus the City was only entitled to the portion of the funds representing the assessed property values within the City's geographical limits. As those property values represented only 43% of the total assessed property values in Sumter County, the circuit court found Hair correctly awarded the City fire department only 43% of the fund.

## DISCUSSION

Mathis argues the circuit court's interpretation conflicts with the plain meaning of the statute, ignores the purpose and legislative intent of the statute, and ignores the traditional use of "first response" area to mean the "service area" of the fire department. We agree.

The primary purpose in construing a statute is to ascertain legislative intent. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). "If a statute's language is plain

and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning." *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995). The legislature intends to accomplish something by its choice of words, and not do a futile thing. *State ex rel. McLeod v. Montgomery*, 244 S.C. 308, 314, 136 S.E.2d 778, 782 (1964).

Although the term "service area" has not been defined in the statute creating and governing the fund, it has been defined in other statutes. Section 5–7–60 provides in part that any municipality may provide its services outside its corporate limits by contract, and the statute defines a designated "service area" to mean the area in which a particular service is being provided. S.C.Code § 5–7–60 (1977); *see also City of Darlington v. Kilgo*, 302 S.C. 40, 43, 393 S.E.2d 376, 378 (1990) (area outside cities' boundaries that cities provided limited fire protection to pursuant to contract was a "service area" of the cities and thus could not be included in the county fire district plan without prior agreement with the city). Further, counties can cede responsibility for the fire protection services of certain areas to cities via contract. Section 4–19–10(b) provides that counties have the power to

designate, subject to the provisions of § 4–19–20, the areas of the county where fire protection service may be furnished by the county under the provisions of this chapter (referred to in this chapter as *service areas* ); provided, however, that these *service areas* shall exclude those areas where *fire protection is then being furnished by some other political subdivision* unless an agreement be entered into between the county and such other political subdivision for the joint exercise of fire protection powers within the service area of such political subdivision and the sharing of costs thereof.

S.C.Code Ann. § 4–19–10(b) (1986) (emphasis added).

■ It is apparent the legislature intended the 1% premiums collected in a particular location to benefit the fire fighters risking their lives in that particular "service area." Although "service area" is not defined in the statute, its plain and ordinary meaning is the area where the fire department provides services. This definition is bolstered by the legisla-

ture's use of the same definition in other fire protection statutes and by common usage in the industry.

Because the circuit court concluded Hair correctly distributed the funds by geographic boundaries, it made no findings regarding which department provides service to any particular area. The parties dispute which department or departments provide service to any particular area. Therefore we remand for a factual determination as to which department or departments, if more than one, provide service to each area, and a ruling disbursing the fund consistent with this opinion.

**REVERSED AND REMANDED.**

CURETON and SHULER, JJ., concur.